# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DONLEY MCINTOSH,

   Plaintiff,

v.             Case No. 18-CV-1610

NANCY BOWENS and
DR. DILIP TANNEN,

   Defendants.

## DECISION AND ORDER

  Plaintiff Donley McIntosh, who is represented by counsel and confined at Racine Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 1.) McIntosh alleges that defendants Nancy Bowens and Dr. Dilip Tannen violated his constitutional rights when they were deliberately indifferent to his gastrointestinal issues. The defendants filed a motion for summary judgment, which has been fully briefed and is ready for resolution. (ECF No. 41.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 3, 17.)

### 1.   Facts

*1.1 Parties*

  Plaintiff Donley McIntosh is currently incarcerated at Racine Correctional Institution, but at all times relevant to this case he was incarcerated at Oshkosh Correctional Institution. (ECF No. 52, ¶ 1.) Defendant Nancy Bowens was employed by the Wisconsin Department of Corrections (DOC) as an Advanced Practice Nurse

Prescriber, and defendant Dr. Dilip Tannen was employed by the DOC as a primary care physician. (*Id.*, ¶¶ 2-3.) Both were assigned to Oshkosh. (*Id.*)

### 1.2  Narrowing of Issues

At screening McIntosh was allowed to proceed on Eighth Amendment claims of deliberate indifference to medical needs against Bowens and Dr. Tannen for their failure to properly treat his gastrointestinal issues from March 2015 through April 2017. (ECF No. 12.) In their summary judgment materials both McIntosh and the defendants agree that there are no disputes "with the course of treatment pursued by Bowens or Tannan over the first 18 months of Mr. McIntosh's treatment for his abdominal symptoms." (ECF No. 53 at 13; ECF No. 54 at 2.) The parties agree that the only questions to be considered at summary judgment are: (1) whether McIntosh had an objectively serious medical need; (2) whether Bowens acted with deliberate indifference when she put a note on McIntosh's medical file in October 2016 indicating that she observed him outside the clinic and he did not seem to be in chronic pain; and (3) whether Dr. Tannen acted with deliberate indifference when, based on Bowens's note, he cancelled his October 2016 referral for McIntosh to a see a gastrointestinal specialist. (ECF No. 54 at 2.) As such, while the parties submitted voluminous materials outlining in meticulous detail McIntosh's treatment over a nearly two year period, the court will focus on the facts related to these three issues instead of reciting the entirety of McIntosh's treatment from March 2015 through April 2017.

*1.3    McIntosh's Treatment History*

McIntosh first complained of stomach issues in March 2015, when he saw a nurse for diarrhea that had plagued him for the past two months. (ECF No. 55, ¶ 4.) He subsequently had various medical appointments throughout the rest of 2015 and in early 2016 to address his recurring stomach issues, including intense abdominal pain, severe constipation, blood in his urine and occasionally in his stools, a burning sensation in his GI tract, weight loss, nausea, and anemia. (*Id.*, ¶¶5-45.) The defendants tried various treatments, including prescribing several antacids, putting McIntosh on a gluten-free diet, and prescribing medication to deal with constipation. (*Id.*; ECF No. 52, ¶ 27.) It appears that the treatments—most notably the gluten-free diet—provided some temporary relief, though oftentimes the treatments, like the heartburn medication and the antacids, were not successful. (ECF No. 55, ¶¶ 23-25.) The defendants also note that McIntosh often refused treatment or declined to attend appointments. (ECF No. 52, ¶ 6, ¶ 27.) Additionally, McIntosh's complaints were often vague, or his complaints in a later appointment contradicted his complaints from an earlier appointment, which made diagnosis difficult. (*Id.*, ¶ 28.)

On October 3, 2016, after 18 months of various treatments, Dr. Tannen referred McIntosh to a gastrointestinal specialist for evaluation. (ECF No. 55, ¶ 46.) Ten days later, on October 13, 2016, before an appointment with the specialist was scheduled, Bowens wrote a note in McIntosh's medical record that stated, "While writer was walking down toward B-Building from HSU. Observed pt. [McIntosh] walking toward writer. Laughing joking [with] peers. No pain behaviors exhibited." (ECF No. 55, ¶

3

47.) Bowens stated she wrote that entry as evidence that McIntosh was fabricating or exaggerating his condition. (*Id.* ¶ 48.) Bowens also stated that, in the nearly two years of treating McIntosh, she made other observations that led her to believe that McIntosh was not in as much pain as he was reporting. (*Id.*; ECF No. 44-6 at 13, 44:6-45:25.) For example, on one occasion she observed McIntosh acting alert and not in any distress after he used the bathroom, indicating he was not in pain. (*Id.*)

It is undisputed that, after Bowens made her entry in McIntosh's medical record, on October 13, 2016, Dr. Tannen cancelled the referral to the specialist. (ECF No. 55, ¶ 50.) In his deposition Dr. Tannen stated that he decided to cancel the referral to the specialist in part because of Bowens's report that McIntosh was joking, laughing, and not showing any discomfort, but that this alone would not have led him to cancel the referral. (ECF No. 44-5 at 20, 72:14-73:23.) Dr. Tannen stated he cancelled the referral because, in his opinion, in October 2016 McIntosh was "seemingly … fine and we can hold off on the referral at this time." (*Id.* at 22, 79:24-80:2.) Dr. Tannen believed that McIntosh was exaggerating or fabricating his symptoms. (*Id.* at 20, 73:20-23.)

At another medical appointment on November 10, 2016, McIntosh complained of abdominal pain that was "getting worse," as well as nausea, vomiting, and diarrhea. (ECF No. 55, ¶ 53.) When McIntosh saw Dr. Tannen on January 5, 2017, again complaining of gastrointestinal issues, Dr. Tannen issued another referral to a GI specialist. (*Id.*, ¶ 54.) On March 3, 2017, prior to McIntosh's appointment with the

4

specialist, Dr. Tannen again examined McIntosh and prescribed him "bismuth liquid" because he suspected McIntosh may have an H. pylori infection. (*Id.*, ¶ 56.)

On March 23, 2017, McIntosh saw the GI specialist, Dr. Mary F. McDonald. She noted that McIntosh appeared to be suffering from significant GI issues, such as pain, diarrhea, and constipation. (ECF No. 55, ¶ 57.) She also noted that McIntosh was anemic and recommended an upper GI endoscopy (EGD) and a colonoscopy. (*Id.*) McIntosh had an EGD and colonoscopy on April 19, 2017, which indicated that McIntosh had an H. pylori infection that caused gastritis and "fundal erosions," which were in the "superficial" stage. (*Id.*, ¶¶ 58-59; ECF No. 52, ¶¶ 17-19.) It also appeared that McIntosh had irritable bowel syndrome (IBS). (ECF No. 55, ¶ 65.) McIntosh was started on antibiotics, which alleviated his symptoms for approximately a month. (*Id.*, ¶ 60.) However, he started having symptoms again in July. (*Id.*, ¶ 61.) By December 2017, another EGD showed that McIntosh's H. pylori infection had cleared up. (*Id.*, ¶ 66.) It is undisputed that, after McIntosh saw the GI specialist, the defendants, in caring for McIntosh, followed the specialist's recommendations. (ECF No. 52, ¶ 34.)

1.3   *McIntosh's Expert's Findings*

McIntosh retained an expert, Dr. David Blake, to opine on the treatment provided by the defendants. (ECF No. 44-3.) After reviewing two years of McIntosh's medical records, Dr. Blake opined that McIntosh was diagnosed with an H. pylori infection and IBS in Spring 2017. (ECF No. 52, ¶ 11.) Dr. Blake also determined that McIntosh had a superficial erosion, which in Dr. Blake's opinion was not an emergent or urgent issue but could worsen if left untreated. (*Id.*, ¶ 18.) McIntosh's erosion did

5

not progress to an ulceration. (*Id.*, ¶ 19.) In summary, Dr. Blake determined that McIntosh suffered from mild gastritis as a result of his H. pylori, and his H. pylori infection was not serious. (*Id.*, ¶ 20.)

Dr. Blake also considered the treatment that Bowens and Dr. Tannen provided to McIntosh over a two-year period and determined they were reasonable and appropriate. (ECF No. 52, ¶ 27.) In Dr. Blake's deposition, he stated specifically that "there was nothing inappropriate about a gluten-free diet, nothing inappropriate about antacid therapy, nothing inappropriate about laxatives. All of those things are fine and appropriate." (ECF No. 44-4 at 14, 53:5-10.)

Where Dr. Blake took issue with the defendants' treatment was their delay in referring McIntosh to a GI specialist. In his deposition he stated, "It's the fact that multiple treatments were attempted, none of them were successful, the patient was continuing to be symptomatic and more than two years—or more than two years of this type of approach, the community standards would have been to be referred to a gastroenterologist much sooner. That's my opinion." (ECF No. 44-4 at 14, 53:11-17.) According to Dr. Blake, "consultation with a gastrointestinal specialist is warranted under two circumstances: 1) where there is reason to believe that a patient is having a 'serious problem,' or 2) when a patient continues to have symptoms that are not responding to therapy." (ECF No. 52, ¶ 7.) Dr. Blake identified the types of "serious problems" that would necessitate immediate referral to a specialist to be "vomiting blood, rectal bleeding, fecal-positive stool (which is a test that indicates the presence of blood), and evidence of anemia." (*Id.*, ¶ 9.) Based on McIntosh's treatment history, Dr.

6

Blake thought that McIntosh should have been referred to a specialist at least six months prior to the January 2017 referral. (ECF No. 55, ¶ 63.)

However, when asked whether the delay in seeing the specialist negatively impacted McIntosh, Dr. Blake stated, "Fortunately, the treatment would have been the same. He was fortunate that this hadn't progressed to the point where he perforated an ulcer and developed peritonitis or something, which would have been requiring a lot more therapy, so no [the delay did not negatively impact McIntosh]." (ECF No. 44-4 at 14, 56:3-8.) Dr. Blake also acknowledged that deciding whether to send a patient to a specialist is "certainly a judgment call." (ECF No. 52, ¶ 40.)

Additionally, Dr. Blake stated that he could not determine when McIntosh's H. pylori infection began or whether he had an H. pylori infection in October 2016. (ECF No. 52, ¶ 21.) Dr. Blake also acknowledged that diagnosing IBS is extremely difficult, especially when the patient does not always follow the recommended course of treatment. (*Id.*, ¶¶ 24-26.) Additionally, treating IBS is often trial and error because IBS treatment depends on the particular symptoms a particular patient is experiencing. (*Id.*, ¶ 25.)

2.  **Summary Judgment Standard**

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit."

7

*See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

3. **Analysis**

The Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,' including . . . grossly inadequate medical care." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first

8

examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

*3.1 Whether McIntosh's Gastrointestinal Issues Were Objectively Serious*

"An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (quoting *Zentmyer v. Kendall Cnty.,* 220 F.3d 805, 810 (7th Cir. 2000)). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The United States Court of Appeals for the Seventh Circuit's "cases demonstrate that a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit." *Roe . Elyea*, 631 F.3d 843, 861 (7th Cir. 2011).

The defendants argue that McIntosh has not established that he suffered from an objectively serious medical condition because the evidence he relies on consists of diagnoses from Spring 2017 when the time-period at issue is October 2016. (*See* ECF No. 54 at 3.) The defendants also assert that McIntosh has failed to establish he suffered from chronic pain because his medical history indicates that he often refused

9

treatment, skipped appointments, or failed to take medications as instructed. McIntosh also made vague and contradictory complaints about his health.

However, when viewed in a light most favorable to McIntosh, the facts support a finding that McIntosh suffered from an objectively serious medical condition. District courts within the Seventh Circuit have held that, where a plaintiff presents evidence of complaining about stomach issues for several months that ultimately culminate in the diagnosis of conditions like H. pylori and/or IBS, the plaintiff sufficiently alleges an objectively serious medical condition.

In *McCoy v. Wexford Health Sources, Inc.*, Case No. 12-CV-5467, 2018 WL 4563076 at *4-5 (N.D. Ill. Sept. 24, 2018), the plaintiff asserted that the defendants violated his Eighth Amendment rights when they failed to properly treat his stomach issues in Fall 2011. *Id.* at *2-3. In support of his argument, the plaintiff presented evidence that he suffered from those stomach issues from Fall 2011 through June 2014, when he was finally diagnosed with ulcerative proctitis and IBS. *Id.* The defendants argued that the 2014 diagnosis was unrelated to the Fall 2011 stomach issues, so the plaintiff failed to establish he suffered from an objectively serious medical need in Fall 2011. *Id.* at *4. The court held that, because the record contained "repeated complaints over time of the same gastrointestinal problems including abdominal pain, diarrhea, and bloody stool, and the same requests for evaluation and treatment," a reasonable factfinder could conclude that the plaintiff suffered from an objectively serious medical condition. *Id.*

Other courts similarly have held that stomach issues that eventually worsen into conditions that require treatment, like H. pylori and IBS, satisfy the objectively serious prong. *See Garcia v. Wexford Health Sources, Inc.*, Case No. 13-C-393, 2015 WL 2258406 at *4 (N.D. Ill., May 11, 2015) (finding the record showed that the plaintiff had an objectively serious medical condition because he was eventually diagnosed with H. pylori and IBS, both of which required treatment); *Bowens v. Randle*, Case No. 10-C-2501, 2018 WL 3715728 at * 7 (N.D. Ill., Aug. 3, 2018) (finding that, because H. pylori is a bacterial infection that required medicine to treat, the plaintiff sufficiently stated an objectively serious medical need).

The record shows that McIntosh, like the plaintiff in *McCoy*, repeatedly complained over several months about and was treated for recurring gastrointestinal problems, including intense abdominal pain, severe constipation, blood in both his urine and his stool, heartburn, weight loss, nausea, and anemia. While it is unclear whether McIntosh had H. pylori or IBS in October 2016, he definitely had some sort of gastrointestinal issue starting in March 2015 that culminated in his Spring 2017 diagnoses of H. pylori and IBS. Thus, like the plaintiff in *McCoy*, McIntosh has presented sufficient evidence to allow a reasonable factfinder to conclude that he suffered from an objectively serious medical condition during the time period in question.

> 3.2 *Whether The Defendants were Deliberately Indifferent when McIntosh's Initial Referral to a Specialist was Cancelled.*

In order to demonstrate that the defendants were deliberately indifferent to his serious medical condition McIntosh must show that they "knew about his condition

11

and the risk it posed but disregarded that risk." *Pyles*, 771 F.3d at 409. "Something more than negligence or even malpractice is required." *Id*. McIntosh must establish "that the treatment he received was 'blatantly inappropriate.'" *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

McIntosh argues that the defendants were blatantly inappropriate in two ways that are intertwined: 1) when they cancelled his referral to the specialist in October 2016, which then caused 2) a six-month delay in treatment. "A prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care" because such a decision "involves the exercise of medical discretion." *Pyles*, 771 F.3d at 411. Prison doctors are deliberately indifferent in their choice not to refer to a specialist "only if that choice is blatantly inappropriate." *Id.* Choosing not to refer someone to a specialist is blatantly inappropriate where "the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person." *Id.* at 412.

A delay in treatment is blatantly inappropriate where it is inexplicable and "serves no penological interest." *Petties*, 836 F.3d at 730. "[W]hether the length of the delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* "To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged the pain." *Id.* at 730-731. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those

12

circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

### 3.2.1 Whether Bowens was Deliberately Indifferent

Bowens observed McIntosh's behavior outside the clinic that, in her professional judgment, she considered relevant to his medical care, so she noted it in his medical file. McIntosh presented no evidence that Bowens did so for any other reason. At most, McIntosh states that out-of-clinic observations that suggest he was not in as much pain as he said he was constitutes "gratuitous cruelty," but he offers no evidence supporting that assertion. Bald assertions that are not bolstered by evidence are insufficient to create a genuine issue of material fact. *Drake v. Minn Mining & Mfg Co.*, 134 F.3d 878, 887 (7th Cir. 1998). As such, no reasonable factfinder could conclude that Bowens's reason for placing the note in McIntosh's medical file was blatantly inappropriate. Summary judgment will be granted in her favor.

### 3.2.2 Whether Dr. Tannen was Deliberately Indifferent

As for Dr. Tannen, McIntosh argues that it was blatantly inappropriate to cancel the referral to the specialist based on Bowens' note, which delayed McIntosh's treatment. However, McIntosh again fails to establish that Dr. Tannen made this decision outside the realm of professional judgment and in such a manner that no minimally competent doctor would have done the same. To be sure, the deference courts provide to medical professionals using professional judgment "does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision. When the plaintiff provides evidence

13

from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (emphasis in original). Dr. Tannen stated that he made the decision to cancel the referral in part based on Bowens's observations and in part based on his extensive experience treating McIntosh. It is undisputed that, over the course of two years, McIntosh responded to some treatments, his symptoms would ebb and flow, and his complaints were often vague and contradictory. Considering this context, whether McIntosh needed to see a specialist in October 2016 was a judgment call.

McIntosh offers the testimony of an expert, Dr. Blake, to attempt to establish that Dr. Tannen's judgment call was blatantly inappropriate. Dr. Blake, however, focuses primarily on the delay in seeing the specialist, opining that "the community standards would have been to be referred to a gastroenterologist much sooner." (ECF No. 44-4 at 14, 53:11-17). However, this criticism is more of a disagreement between two medical professionals "about the proper course of treatment, [which] generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409. Simply opining that, generally, it probably would have been better to have McIntosh see a specialist sooner is more in the realm of malpractice or negligence rather than "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id*. Indeed, Dr. Blake admitted that such a decision was a judgment call.

It is also undisputed that, after he canceled the referral to a GI specialist, Dr. Tannen still continued to regularly treat McIntosh. After a few more months of complaints, in January 2017 Dr. Tannen changed his mind and again decided to have McIntosh see a specialist. This diligent monitoring of McIntosh's condition is additional evidence that Dr. Tannen was simply exercising his professional judgment as to the proper treatment for McIntosh. This case is unlike the medical professionals in *Greeno v. Daley*, who for several months stubbornly refused to alter or try any new treatments despite the fact the plaintiff's health was obviously deteriorating. 414 F.3d at 654. Dr. Tannen was regularly trying new treatments, and it was not obvious that McIntosh was getting worse.

Also, McIntosh does not establish that the delay exacerbated his injury or unnecessarily prolonged his pain. McIntosh's own expert testified that the treatment required in October 2016 would have been the same as the treatment McIntosh received in April 2017. Dr. Blake also could not determine if McIntosh's H. pylori infection or IBS resulted from the delay, so there is no evidence in the record indicating that the delay caused his condition to worsen. There is also no evidence that McIntosh's pain was unnecessarily prolonged. While McIntosh did have some relief after seeing the specialist in March and April 2017, by July 2017 he was experiencing painful symptoms again, even though he was being treated according to the specialist's recommendation. Dr. Blake further opined that treating IBS is often trial-and-error and agreed that generally Dr. Tannen was doing what he could to address McIntosh's symptoms.

In short, no reasonable factfinder could conclude that Dr. Tannen, in deciding to hold off on McIntosh seeing the specialist, was acting without professional judgment and in such a way that was blatantly inappropriate. Summary judgment also will be granted in his favor.

**ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 41) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time,

generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 6th day of July, 2021.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge